UNITED STATES of America, Plaintiff,

v.

Berkeley JOHNSON, Defendant.

No. 04–CR–173–C.

United States District Court, W.D. Wisconsin.

Feb. 4, 2005.

Rita Rumbelow, for Plaintiff.

Paul F. X. Schwartz, Attorney at Law, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

Before the court is defendant Berkeley Johnson's motion to suppress his post-arrest statements. Defendant also filed a motion to suppress the search of his residence, but has decided not to brief that motion. Accordingly, I am denying this motion as abandoned.

Defendant seeks to suppress his post-arrest statements on the ground that the police subjected him to custodial questioning without *Miranda* warnings and followed up their questioning with warnings and additional questioning. According to defendant, suppression of all his statements is mandated by *Missouri v. Seibert*, — U.S. —, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The government concedes that police officers subjected defendant to one question before giving him the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but contends that the controlling case is *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which would not require suppression. The government is correct. Therefore, I am denying this motion as well.

The parties have stipulated that this court could use the police reports of the questioning as the factual record for deciding defendant's motion to suppress his statements. Defendant has attached copies of those reports both to his motion and his brief in support. Notwithstanding this stipulation, defendant argues that the two reporting officers "differ dramatically" in their report of the timing of *Miranda* warnings. Deft.'s Br. In Supp., Dkt. # 17, at 2. The government disagrees, claiming that the reports are not inconsistent. I have compared the reports and from them I find the following facts.

## FACTS

At about 2:00 p.m. on August 27, 2004, Madison Police Officers Denise Markham and Dorothy Reitzler went to Apartment 315, 5158 Anton Drive, looking for defendant Berkeley Johnson, who they suspected had lied to them about his identity during an investigation the previous day. Apartment 315 was rented by defendant's girlfriend, who maintained telephonic contact with the officers on August 27 and who provided consent for the officers to enter her apartment to look for defendant. Upon being admitted into Apartment 315 by the building manager, the officers found defendant standing in the middle of the living room, half-dressed.

Officer Reitzler immediately arrested and handcuffed defendant for obstructing an officer by his conduct on the previous day. Initially defendant claimed that he did not know what they were talking about but soon admitted that he had given the officers a false name in order to avoid a traffic ticket for driving after suspension.

The officers asked defendant whether he wanted a shirt and shoes; he responded that he did and asked to walk to the back bedroom with the officer to retrieve some clothing. The officers saw marijuana residue on the coffee table. Without first providing *Miranda* warnings, Officer Markham asked defendant whether there were any drugs or any weapons in the apartment. Defendant responded emphatically that there were not.

Defendant declined to provide consent to search the apartment because it was his girlfriend's. Officer Markham telephoned defendant's girlfriend again and obtained her consent to search the apartment for illegal drugs or guns. Officer Markham told her that they were not concerned about the marijuana residue they had seen on the coffee table. Officer Markham promised defendant's girlfriend that defen-

dant could watch the officers as they searched.

As a result, defendant watched Officer Markham search the bedroom from which they had retrieved his clothes. Defendant continued to volunteer that there were no drugs in the apartment. As if on cue, Officer Markham found several baggies coated with white residue. Officer Markham displayed these to defendant; he denied that he was involved with any other drugs besides the marijuana found in the living room.

Concerned about defendant's volubility, Officer Reitzler produced her wallet card and read defendant his *Miranda* rights. She asked defendant whether he understood his rights and he responded, "Yes." Officer Reitzler took it a step further, advising defendant that he could be incriminating himself with his statements, so she wanted to insure that defendant understood his rights. Defendant confirmed again that he understood.

Officer Markham subsequently found two scales and an identification card of a another person the police suspected of selling drugs. Defendant continued to volunteer that he was not involved in drug sales. Officer Markham asked defendant whether he would just tell them where the drugs were to make it easier on everyone and to show his cooperation. Again, defendant denied involvement with illegal drugs. After Officer Markham found a few more baggy corners coated with white residue, Officer Reitzler accused defendant of being a cocaine dealer. Defendant told Officer Markham that he "wanted to be real with her," so he told her that there were two handguns in a shoe box under the bed and he explained how he had obtained them. Defendant continued to insist that there were no drugs in the apartment. The officers continued to search and ultimately called for backup, including a drug sniffing dog. The dog alerted in the bathroom, where the officers recovered approximately one ounce of cocaine divided into nine baggies.

The officers took defendant to the police station where they initiated formal questioning. Officer Reitzler asked defendant whether he remembered her having read him his rights at the apartment or wanted them read again. Defendant requested a re-reading. Officer Reitzler again produced her wallet card, read defendant his *Miranda* rights, asked him whether he understood and received a positive answer. Defendant indicated a willingness to talk, then confessed to cocaine trafficking inconsistent with the physical evidence recovered from the apartment and admitted that he kept the handguns for protection because he knew drug dealers can get ripped off.

## OPINION

The government does not intend to offer in its case in chief any post-arrest statements that defendant made to the police before Officer Reitzler read him his *Miranda* rights. However, the government does intend to offer in its case in chief all statements that defendant made to the police after he received his *Miranda* warnings.

Defendant contends that the officers' pre-*Miranda* questioning of him tainted all subsequent interrogations, both at the apartment and at the police station. Defendant compares his situation to that at issue in *Missouri v. Seibert*, —— U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643. In *Seibert*, the interrogating officer intentionally employed an interrogation technique he had been taught in which he questioned the suspect without providing warnings first and obtained a confession and then provided *Miranda* warnings and repeated the questions to obtain the same answers "legally." *Id.* A plurality of the Supreme

Court held that this "question first" interrogation technique did not serve *Miranda*'s purpose and therefore the results were inadmissible. According to the plurality, the threshold inquiry was "whether it would be reasonable to find that in these circumstances, the warnings could function 'effectively' as *Miranda* requires." *Id.* at 2610. The plurality determined that it was likely that post-confession *Miranda* warnings would be ineffective in preparing a suspect for successive interrogation close in time and similar in content because a suspect who had just admitted guilt "would hardly think he had a genuine right to remain silent." *Id.* at 2611.

■ *Seibert* does not necessarily apply to the type of two-stage interrogation approved in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222. *See United States v. Stewart,* 388 F.3d 1079, 1087 (7th Cir.2004). In *Elstad,* the police arrested the defendant in his home and explained why they were arresting him. The defendant made self-incriminating statements in response. After being taken to the sheriff's headquarters, the defendant received full *Miranda* warnings, waived his rights and confessed. The Supreme Court held that the failure to give the defendant his *Miranda* warnings before his initial inculpatory statement did not require suppression of his subsequent warned confession:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad,* 470 U.S. at 310, 105 S.Ct. 1285. In other words, a suspect who first responds to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings, so long as the second statement is voluntary. *Id.* at 318, 105 S.Ct. 1285.

After glossing the various opinions of the fractured Court in *Seibert,* the Seventh Circuit determined that the only opinion commanding five votes is that whenever police deliberately use two-step interrogations in which they intentionally withhold *Miranda* warnings until after obtaining a confession, the voluntariness inquiry of *Elstad* is replaced by a rule of presumptive exclusion subject to a multi-factor test for change in time, place and circumstances from the first statement to the second. *Stewart,* 388 F.3d at 1090. Only four justices would have applied this test to a two-part interrogation that was not part of a deliberate strategy to undermine *Miranda* warnings. *Id.* Therefore, in such a case, the *Elstad* voluntariness test would control. This is such a case.

■ Defendant argues that the officers' own reports reveal a deliberate two-part strategy to circumvent *Miranda.* The officers' conduct gives defendant room to argue, but I conclude that although this may have been shoddy police work, it was not part of a scheme to trick defendant into confessing. The only question the officers posed to defendant before warning him was whether there were drugs or guns in the apartment. The officers should not have asked this without warning defendant. Undoubtedly, they knew it. But defendant lied and said that there were no drugs or guns in the house. Rather than continue with any sort of an interrogation designed to obtain a confession, the offi-

cers asked no further questions, focusing instead on executing their search.

Defendant contends that the search was questioning by other means because the police brought him into the rooms that they were searching and displayed what they found to him, hoping to provoke a self-incriminating response. Ordinarily it would be better for the police not to drag an arrested suspect from room to room during a search in order to avoid exactly the sort of accusations leveled by defendant. However, the police had promised defendant's girlfriend, the lessee of the apartment, that he could watch whatever searching they did. So even if defendant's running commentary could be viewed as motivated by watching Officer Markham retrieve and display to defendant evidence indicating drug trafficking, on this record this interaction was not the functional equivalent of questioning. *See, e.g.,* the June 21, 2004 Report and Recommendation in *United States v. Ruffin,* 04–CR–048–S, 2004 WL 1447815 at *6–7.

To the contrary, defendant's self-exculpatory patter was so unrelenting that the officers became concerned that he might unknowingly blurt out a self-incriminating admission. (I assume that this concern was based not on altruism so much as their desire to avoid any suppression claims attendant to an un-warned admission). Officer Reitzler read defendant his rights, insured that he understood them and even warned Defendant that she was concerned that he was incriminating himself.

Then, despite having warned defendant, the officers did not attempt to interrogate him at that time. Instead, they continued with their search for drugs. This was the sort of conceptual break required by *Elstad:* after the *Miranda* violation there was a hiatus in questioning during which the police provided *Miranda* advice, after which the hiatus continued while the police continued to search.

Meantime, defendant continued to deny trafficking drugs, but then switched gears and volunteered to "be real" with the officers by alerting them to the presence of two firearms under the bed. This admission was not in response to any direct question or the functional equivalent of any questioning from the officers; most likely, defendant was trying to soften his landing in anticipation of the inevitable discovery of his guns. Thereafter, when the officers did pose direct questions to defendant at the apartment, he minimized his criminal conduct.

Contrary to defendant's interpretation of his interaction with the police, this was not a "question first" interrogation in which the police set out to circumvent *Miranda.* The officers asked one improper question, received an exculpatory answer and left it at that. They asked no more questions at that time and they did not undertake the functional equivalent of questioning. The main reason the officers warned defendant at the apartment was because he did not stop talking. They provided these warnings before he said anything useful to them.

As just noted, there was a conceptual break between the initial improper questioning and the administration of *Miranda* warnings. Further, there were no coercive circumstances here that might have compelled defendant to answer the officers' subsequent questions. Indeed, defendant volunteered his most incriminating statement when he announced the presence and location of his handguns. Therefore, defendant is not entitled to suppression of the statements he made to the officers after they warned him at the apartment.

What followed was an even more significant break in time, place and circumstance when the officers took defendant downtown to process him and then formally

question him. Before beginning that questioning, the officers again gave him *Miranda* warnings. Defendant acknowledged his understanding of his rights, agreed to speak with the officers and then inculpated himself. As in *Elstad,* the officers' actions were not coercive and defendant's responses to all questions put to him were knowing and voluntary. There is no basis on which to suppress any of the challenged post-arrest statements.

## ORDER

It is ORDERED that defendant Berkeley Johnson's two motions to suppress evidence are DENIED.